Good morning, Your Honors. I'm Ellen Lake, counsel for plaintiffs and appellant Willis. I'd like to reserve two minutes for rebuttal. This case involves the use of excessive force against Stephen Willis, a 23-year-old student. He died in a hail of 41 bullets at the hands of two Fresno police officers. Stephen's parents sued under 1983, but the district court granted summary judgment on all claims against all defendants. We seek a reversal here. There are about three major principles that the court has to take into account in this case. The first is the standard under 42 U.S. You know, we really do know the law. Okay. That's great. The thing where you could help us is showing us where there are disputed issues of material fact. And I think you can pretty much trust, I think, between the three of us, we've had about 100 years of experience with these cases. Good. No, I'm not going to. So just because time is limited, what are the disputed issues of material fact in this case that would entirely prove a version? You just need one. Okay. And just to give you an idea. Looking at the point when Stephen Willis was down, he'd been shot, he was lying bleeding on the floor of the parking area, making no effort to get up. The disputed issue of fact is whether Officer Catton saw him reaching for the gun that was some distance from him. Catton says, yes, I saw him move it. There's no dispute that he's on the ground. Yes, correct. And there's no dispute that there's a gun that he conceivably could have reached on the ground. Yes. Okay. And the officer says, I told him, don't reach for the gun, if I remember correctly. It was something like that? That's the officer's testimony. Okay. And there are witnesses who confirm that the officer said that. No, I don't believe there are, Your Honor. No? Okay. There are no witnesses of that at all, are there?  There are no witnesses of that particular incident at all, are there, except the officer? Well, Officer Jacoby comes up immediately as he hears the and sees the flash of Catton's gun, and what he hears Catton say is, I see the gun, I see the gun. He says that after he's shot Mr. Willis, and he doesn't ever say anything about  the gun. Additionally, Officer Jacoby is questioned, did he ever explain why he shot the victim? And Jacoby says, no, he never explained, no, he did not. So you're saying that's enough to create a genuine issue of fact? Yes, absolutely, Your Honor. The fact that he sees a man and says... That's your best? That's my best. That's your best? It is. No other better facts in this whole instance? Well, I mean, around those facts are the following. That three other officers who are present right before this happens and right after this happens say they see no reason to shoot Mr. Willis, that there is no immediate risk of danger or of serious injury. But Jacoby... Well, that doesn't help you all that much because different officers from different angles have a different view of the situation. So there might well be three or four officers in the area and three of them don't see a danger. And the one officer can see a danger because he happens to be in a position where he can see the gun within reach, right? Well, the other officers also have different ways of dealing with whatever danger there might be. We have Catton, who is this 18-month probationary employee who is so scared that the other officers comment about how he's completely panicked. But these other – but the officers like Astacio, Jacoby, and Cerda say, for example, if I just keep my gun on him, that's enough because then if he actually does move, then that's the time to take action. Or Cerda puts his foot over the gun and says, I can move it away, I can kick it away so that he can't reach it. So all these are different ways to deal with – I'm sorry. This is what Cerda actually did? This is what he actually did, yes. He kicked the gun away? Well, first he put his foot over so as to – in the beginning of the incident, this part of the incident, so that if there was a reaching for the gun, excuse me, for the gun by Mr. Willis, Cerda could have kicked it away, and then ultimately he does kick it away. Which shows – This is after? This is – Before he got shot, after he got shot? No. This is right after he got shot. But when he's still moving, presumably he could still have reached for it if he hadn't previously reached for it. It's a way of dealing at a much lesser level of violence against Mr. Willis. In other words, part of the reasonableness calculation is whether there are other ways to deal with it rather than shooting Mr. Willis in the back several more times. But we do give some substantial degree of deference to the officer on the field, and the fact that there might be a less lethal way of dealing with a situation in the heat of the moment or, you know, sometimes there are better ways and worse ways, but it doesn't mean that the worse way is constitutionally impermissible. No. But reasonableness, as the Court has said many times, is a question of fact for the jury. And so the question of whether this method was reasonable as compared with these other methods should be a fact-finding, a factual issue that requires a trial. But going back to the... Do we know whether those last shots were fatal? We have the Dr. DiMaio saying that one of the three shots to the back was fatal, and I think we can infer for purposes of summary judgment that it was a final shot that was fatal because that's the point at which Mr. Willis almost momentarily dies. For summary judgment purposes, yes, I think we can say it was fatal. But I'd like... He could have died from an earlier shot. It's just that he expired a little bit later. But you say that's a question to be explored at heart. That's right. But I'd like to go back, because I'm seeing the Court's lack of being persuaded on my first point, which is... Don't you have a stronger point on the question of whether the officers began firing before he removed his gun from the holster? I think that's a very strong point as well. So shall I turn to that now? Well, just summarize the conflicting evidence which might give rise to a genuine issue of material fact. Okay. So Mr. Willis is at the trunk of his car. He picks out his holstered revolver. He's holding it against his chest. He turns around. The officers are coming at him with this light, and Officer Catton says, before Willis pulled the gun out of his holster, we shot him. We started to shoot him. Well, what he actually said was, by the time Stephen went and started to pull the gun from his holster, we had already fired and then started to move. That's right. That's pretty compelling. I agree. I agree. And at that point... Well, I'm sorry. I'm not quite getting it. I'm just trying to get a clear picture. So what is the argument? The whole incident begins when simply seeing Stephen Willis with his holstered gun, the officers begin to shoot at him. And in fact, they shoot him. Astacio shoots him at least twice in the chest, and Catton certainly thinks he shot him. Let's go back just a couple of steps, you know, rather than sort of starting where he's at. He's at his car. He's facing away from the officers, right? Yes. The trunk is open, and he comes up and turns around, and he is holding a holstered gun, right? Yes. Now, what happened before that? What was the condition? Did they say stop? There's a conflict in the evidence. Our witnesses say they heard nothing such as stop or drop the gun or we're police officers or state your name. These are the witnesses who were occupied doing other things. But they were in the apartment complex near the parking garage. But they really sort of paid attention to the incidents once they heard gunshots. Well, yes, that's right. But there's no reason for them to pay attention to what's going on in the parking lot when there's nothing. But on the other hand, the gunshot, Catton says that he yelled it really loud so that anybody around there could have heard it. That's what he testifies to. So he yelled what? He says, Catton says that very loudly he said to Mr. Willis, you know, we're Fresno police officers that want to talk to you. He said it was as loud so that anybody around there could have heard. And therefore, it's reasonable to infer that the witnesses who were in the – on their patios in the area of the garage would have heard him say that if they had said it. It is evidence that they did not say it. I'm sorry. Go ahead. I didn't hear you. I'm trying to – so they silently come up on him and start shooting. I'm – I'm – Yeah, well, they – What is the – what is the – what would you tell the jury? What would you try to have the jury find? I have the jury find that he turns around with the holstered gun, they shine a light on him, they start to shoot him immediately. He turns – he starts – With no prior interaction between him and the police. Yes, that's correct. That's correct. And as I understand it, that's what Cadden said. Yes. He said by the time Dishner went and started to pull a gun, we'd already fired and then started to move. Yes. So I never saw at that point until I faced off with him in front of the vehicles, that's when I saw the pointed gun. That's what he said later on, right? Yes. That's what he said immediately. However, we do have – I mean, your witnesses, as I understand them, are Darling Jenkins, Zimmerman, and Uribe, and then Cadden himself, right? Aren't those your best witnesses? Only witnesses? Well, the two witnesses, yes, are Jenkins and Zimmerman. Yeah, and Jenkins said she told the cops she heard somebody yell, move, move, move, and drop the gun as the shots were fired. As the shots were – That's what she told. That's what she said, right? Yes, but not before. Yeah. And, I mean, I think what you're trying to do is show a genuine issue of fact, right? Yes. So we got one witness out on a patio near the parking lot with three friends. The patio faced away from the parking lot, and you're going to rely on what she says. Zimmerman's on a patio when the cops go past. He was talking and telling another person about cops. He did hear voices before the shooting began. Doesn't think it was like freeze or something. Couldn't tell who it was. Didn't hear anything, the officer ID. So you're going to rely on those and Cadden, what he said later on, which he has testimony which says it's different. And you say that's a genuine issue of fact. I say that's the beginning of the genuine issues of fact disputes for that part of the incident. Then it goes on and continues. For example, one of the two officers says, Astacio says, that Willis turns around and starts to fall as a result of being shot. Cadden says that Willis continued to move away holding a gun. Quite a different image. But most importantly, when Willis gets behind he seems to be trying to get away from this barrage of bullets from what to him might well seem people he has no idea who they are. And so he goes behind the minivan, at which point the two officers, in violation of their training as to how you deal with a situation, come on the same plane and start shooting at Willis, but also because they're opposite each other, at each other. And so their entire explanation about why they think that he is a danger is the result of their shooting at each other, and the evidence is pretty clear, or at worst, there's a disputed issue of fact, that Willis never shot a bullet at all at the officers. I'm interested, because one of your claims is, of course, against the Chief and against the City of Fresno. I appreciate you're trying to delineate your disputed issues of fact as it relates to the officers, but as to the Chief and Fresno, you've already said they were trained and it was against their training what they did. I didn't see any evidence of pattern of abuses in the evidence. The evidence in relation to Monell and the Chief is that there is, first of all, that the investigation that the police department conducts of these officer-involved shootings is poor and it's biased. Well, just a minute. The investigation is poor and biased. But what you're really supposed to show is that somehow the training, the supervision are we just going to investigation now? You're leaving out training, you're leaving out supervision, you're leaving out discipline? No. I'm about to go on to them. I mean, what worried me about this is I can't find any evidence of pattern abuses, of abuses against these people. Well, the pattern is that the Where is there other evidence? The other evidence is that it takes three to five years to investigate any officer-involved shooting. Therefore, there is no training or discipline that comes out of these investigations in any kind of a timely fashion. So in effect, the officers feel like they can get away free because as a result of all these delays, nothing comes of any of these shootings. And you agree that you sued the chief in his individual capacity, right? Only. Well, no. I think he's sued in both capacities. But just a minute. You sued him in his individual capacity. Well, that's yes. And in the individual capacity, don't you have to show that he caused the deprivation of a right? But he's the, he's the person. Don't you have to show that he caused the deprivation of a right? Yes. And there's no evidence about that. Well, first of all, he's the person at the top of the police department. So he's the person who would discipline anybody if anybody ever got disciplined for these officer-involved shootings. That's your best argument? Well, and then the other thing is that we were deprived of the opportunity to get other evidence that we had moved to compel against the Fresno Police Department that showed an extensive pattern of, of, of. Did you ever file a motion to get any discovery? Yes. We moved, we first, we moved for the discovery. It seems to me that given the record, you had some discovery requests out there, if at all. And after you got down to the point where you were faced with summary judgments, you didn't have anything to do. Finally, at that point, if at all, you filed a motion. But there's evidence in the record that we continually attempted for five months to get the What's a continual attempt? Just continuing to paper them with more discovery? No, there were constant conversations and meetings before or conferences before the magistrate judge over the failure of the police department through its counsel to deliver the redacted files concerning the internal affairs investigation. And in this companion case, Enriquez, where the very same documents were obtained by plaintiff's counsel, the district judge denied summary judgment holding that there was sufficient evidence to establish a Monell claim and a claim against police chief Dyer. We'll hear from the appellees. Mr. Weakley. Thank you, Your Honors. My name is James Weakley. I'm here representing the appellees, City of Fresno, Chief Jerry Dyer, and Officers Estacio and Catton. And, of course, we're here asking the Court to uphold the order granting the motion for summary judgment of the U.S. District Court. To address the issues that the Court was asking of counsel. Counsel, the issue that's bothering me is this question of whether the officers began firing before Stephen removed his gun from the holster. Willis is contending that Estacio and Catton began shooting before Stephen took out the gun. He was merely holding a holstered gun near his chest. I think that's their contention. Yet you have Officer Catton saying in an interview in March 2009 that by the time Stephen went and started to pull the gun from his holster, we had already fired and then started to move. And then later on, in a later deposition, he says Stephen pulled his gun all the way out, and then he began to point it at us, and he got it halfway extended before Officer Estacio fired the first shot. There's an obvious conflict actually in the testimony of the same witness. But nevertheless, isn't there a question of fact? I think what Officer Catton really said in his statement to the investigating officers is he was holding his holster. By the time he went and he started to pull like that, we had already started firing. It wasn't that he pulled it from his holster. He was demonstrating that he was pulling like that. And the evidence is very consistent with the fact that Stephen Wills did fire a shot. Well, that is the problem that I have is that you say, and the evidence is, what you just said is evidence. Is there ever a time where you took all of what the plaintiff says and say that's the fact, and we win nonetheless? I mean, I figure that when I'm doing summary judgment, if I'm going to get out of a disputed issue of fact, I'm going to say everything the plaintiff says is correct, and I still win. I don't say, well, but I've got officers who will say the contrary. That's not the fact. The facts are as they say them, and you have to then suggest that they lose nonetheless. I agree with regard to material facts, but not theories. But material facts, I think my colleague has put it right on the point. If the material facts are as they suggest, you've got an officer saying I pulled and out, and you've got these other people who are propping him up, though they're far away and I'm not too happy about how close they are and whether they ought to be paying attention, how are you going to say there's no disputed issue of fact? Because the statement of Officer Catton is vague. Oh, it's vague. You have to put yourself in the context of what he's demonstrating to the investigating officers. I mean, the bottom line is I'm having a tough time. When I was on your spot and I was defending these things all the time, I always said everything you say is right, and yet we win. Are you suggesting that police can walk up on this guy who hasn't even pulled his gun, who's just turned by the trunk, got his holster up, turned around, and they can start firing, and I can still say that's not a violation of the Fourth Amendment? Are you arguing that? If he never pulled his gun or attempted to start pulling his gun from the holster, then they would not be justified in shooting. If he grabs his gun. All right. Now, let's go further. Let's go further. If he grabs it. Can you say then that based on those facts, if I can't determine who fired first or whether the gun was even drawn, how can I say that those first shots don't have the possibility of shocking the conscience on a Fourteenth Amendment claim? If Mr. Willis. How can I do that? Well, if Mr. Willis never attempted to grab his gun, but that's not what anybody says. Oh, that's not what the cop, what you want your evidence to say. Take their evidence. They don't. Put it right out there, what their evidence says. They don't have. I mean, they got your very officer saying, I shot before he got the gun out. No. He says he was holding his holster by the time he went and started to pull like that. In other words, he's demonstrating to the investigating officer. Starting to pull like that. We had already started. We had already fired and started to move. So he's showing that Mr. Willis had already grabbed his gun, was starting to pull it from the holster as they are starting to shoot. And bear in mind, this is a very rapidly evolving situation. I understand it's rapidly evolving. What I'm trying to say is let's step back and say we're on summary judgment. We're saying all of the facts as alleged by the opposition. If there are no facts alleged, well, that's one thing. Then your facts are the only thing we got. But if there's facts out there, you've got to deal with those facts. That's the worry. Well, that's what I'm trying to do is point out that the fact they're relying upon is not a fact that says they shot him when his gun's still in the holster. They're not saying he never tried to reach for the gun. They never said he didn't grab the gun. But what do we do with Astacio's comment? He said that he's he said he started firing only after he saw Stephen withdraw his gun from his holster and then pointed at me in the straight-arm position. That's not what you just demonstrated to us. Well, that's there's two different officers. Excuse me. Two different officers with two different perceptions. Officer Astacio is standing on the left. Officer Catton is on the right. As Mr. Willis is grabbing his gun, it's going to be pointed towards Astacio before he brings it around. So Astacio is seeing that. The gun apparently is pointed towards him. Catton is seeing him pulling the gun out like that before he starts shooting or he starts shooting. So it's consistent given the fact we have two different officers from two different vantage points seeing the same thing. What do I do with the fact that further, if I just give co-readings to their witnesses, the officers didn't even tell him who they were? Well, Mr. Zimmerman's testimony, and bear in mind, I guess we have to understand this layout. To get into the apartment complex, Mr. Willis had had to make a turn into the apartment complex, a right turn, then a right turn to go down this long driveway to about 100 yards or so down to his parking stall. Mr. Zimmerman is in the apartment at the very beginning of that 100-yard stretch. He's in the backyard overlooking the back fence. When he sees Mr. Willis, he thinks the car is white. We know it's dark. But he hears the car hit the fence. No other cars come through there. The car speeds through the parking lot. And then he later sees the officers walking through, and he identifies them clearly in uniform. You can see their badges, the patches. And it's a dark parking lot. He can see the officers walking down towards the car. The girl he's with is out there smoking marijuana and gets afraid that she's going to get caught by the police. So she runs back into the apartment. He follows her. He gets back into the apartment where there's loud music playing, people talking. He can't hear. And he says, they could have said it. He's not in a position where he can even hear at that point. Just a minute. He says, Zimmerman, I didn't hear any officer ID himself as a police officer, nor did I hear any police officer give a warning. Right. That's because he's not in a position to hear that. By his own admission. He's in the apartment where there's noise going on. There's no fact that says he could have heard that. The same with Ms. Jenkins, who's in an apartment building away from this. Now, she's near the parking lot, because this is a very long parking lot. But she's still quite a distance away from where this incident takes place, in an apartment facing away from the parking lot, protected by other buildings. I understand that. But she said, then I hear, there's nothing, and then all of a sudden I hear some woman say, don't let him go, and the car door slammed, and then two guns fired. We don't know... That's what she said. We don't know who she's talking about, if it was the woman's voice, or the car door slamming was even related to this incident. But it seems a little inconsistent, I guess their argument is, that that's all she heard, and on the opposition, the cops are saying, oh, we yelled our I.D. at him. Not only did we yell our I.D. at him, we yelled at him to throw the gun down. And she didn't hear any of it. She's not in a position to hear it. What she's talking about... See, that's the worry. I'm not trying to tell you you couldn't win. I'm just saying you're on summary judgment, giving every intendment of the fact to the other side. And then you win anyway. So how could I say every intendment of the fact to the other side? I didn't I.D. myself. I didn't wait for the gun to be drawn before I started shooting. And then I look at the 14th and the Fourth Amendment, and I say, on those facts, can I grant summary judgment? And your best bet is we've got conflicting facts or to fight what evidence they got. But that's not a summary judgment to me. I think to prevail on a motion for summary judgment, we need to produce facts that warrant getting a summary judgment granted in our favor, which we did. And frankly, the facts are what the officers say. Well, but frankly, I'm having a tough time understanding how you produce contrasting facts and win. Well, the plaintiff then needs to produce facts, material facts, to contradict our facts. Just having people that were somewhere outside saying I didn't hear anything doesn't contradict us. The plaintiffs have to prove those people could have heard. Well, one of the problems in these cases of excessive force is that probably the best witness is dead. And we have to at least entertain their contention, do we not? Well, don't forget that Ms. Uribe, who was the woman that was in the car that got out and ran to the apartment, told two officers during her interview that she heard yelling before the gunfire. Now, we don't know if that was at the very beginning, because she's not clear about that. We don't know if that was at the very beginning of the gunfire or if that was at the last phase before the last shot, because she's now she's run from the car and run over to an apartment to go in to go into the restroom. But she told two officers who recorded her interview that she heard yelling before the gunfire. Let me ask you another question. As to the excessive force claim, if deliberation is practical, then the deliberate indifference must shock the conscience. If deliberation is not practical or if it can't be done, then the standard is if the act with purpose to harm unrelated to a legitimate law enforcement objective. Is that true? That's the law. All right. So which one of these should we apply here as to the excessive force claim? Well, we believe under the Wilkinson case that we should apply the purpose to harm standard because there was never an opportunity for an officer to deliberate through this whole shooting scenario. So you believe we should, from the time the officers arrived and from the time someone ran into the gate and the officers went over there, that in each one of these circumstances we should apply the purpose to harm? Well, you're talking about the pre-shooting conduct of the officers, which the appellant is not even saying that any of that was wrong. It's once the Mr. Willis reaches for his gun. I'm sorry. Is my time up? Once he... You have about two minutes. Okay. Once Mr. Willis reaches for his gun, then everything is happening so rapidly there is no more time for deliberation. So now we're under purpose to harm. Correct. And even the last shooting incident, remember that last incident where counsel says he was lying on the ground and he was shot in his back and wasn't moving. Again, the evidence, the uncontradicted evidence is, for one, to get an entry wound into his back, he had to be displaying his back towards the officer. He can't get that wound if he's lying on his back. And two is Officer Cerda heard him. As Officer Cerda is approaching, Officer Cerda heard Catton yell, drop the gun. Don't reach for the gun. Now, Officer Cerda, Officer Jacobo, nobody else is in a position to see Mr. Willis or his gun. Sergeant Reyes testified later when he gets there, when Mr. Willis is laying on the ground and everything is done, the gun is near Mr. Willis's left thigh, close to his body. You were asking counsel earlier about Officer Cerda protecting gun with his foot. Remember, all this takes place after the last shot. I mean, these officers aren't there until after the last shot. So what they say about the evidence, what they say about the gun, that's after all the shooting is done. Let me ask you another question, which relates specifically to the training, supervision, investigation, and discipline. It's my understand that the district court denied a request for relief pursuant to local rule 260B as to the discovery. 260B, as I read it, says, if a need for discovery is asserted as a basis for denial, the party opposing the motion shall provide a specification of the particular facts on which discovery is to be had or the issues on which discovery is to be assessed. Is 260B an independent basis for getting documents in the district court here? My understanding is that 260B is the local rule that's really an extension of 56. So you're suggesting that it's not independent, that it goes along with Rule 56? That's my understanding, Your Honor. So if, in fact, 260B is a lesser standard than getting discovery for Rule 56, it should be read according to that rule? In conjunction with Rule 56? Yes, Your Honor. Okay. Thank you. Thank you, Your Honor. I think you are over your time. Will you a minute for a bottle if you wish to take it? I'm sorry, Your Honor. I couldn't hear you. You said it's over my time and what? Well, if you'd like to take a minute for a bottle. Could I yield to Mr. Walker? It's your minute. Go ahead. Judge Kaczynski, I took most of the depositions in the case, and you asked a question about the initiation of this shooting. And what was important, I feel, is that the police were already there investigating bulldog activity. Bulldogs are a major gang in that area. The discrepancy started immediately because there were a number of officers standing around watching what was going on with these bulldogs. They had various stories as to why they noticed a car coming in. The car that Mr. Willis was driving was a dark Infiniti. Mr. Zimmerman, who, as Mr. Wheatley says, was in an apartment right at the corner of the driveway, said the car that he saw race in was actually a small white car, which also was in the pictures that are in the record. It's just to the far right. The officers said when they were 20 feet away, that's when they identified themselves to Mr. Willis. They were not in any hurry. They had not run up. They merely walked into the apartment complex, walking the entire way. And as they walked, they saw a man at the back of a car. They said when they were 20 feet away while still walking, they said such things as, excuse me, sir, we're Fresno Police Department. We would like to talk to you about hitting or an incident that just took place in your automobile. All the time they're walking. An average adult walks four feet per second. They get within ten feet. They see Mr. Willis, who has already had encounters with the bulldogs, who knows it's dangerous territory, turning from his car and turning from the trunk of his car. He has the holster to his chest. And what Mr. Catton, Officer Catton, says is, see the gun, pull my gun. These officers, like Mr. Willis, are in a dark situation in gang territory. If Officer Catton puts the flashlight on Mr. Willis, he doesn't know who they are. He turns. He's already got the gun out. He didn't mean to draw the gun on anyone. But he turns and he has the gun. What's the first thing he does? He grabs for protection. What's the first thing the officers do? They see he has a gun. They see he perhaps has his hand on the gun. They pull their guns and start shooting. Officer Estacio says, I shot first. Then we have varying stories that get told. The first stories told are probably the most reliable. They're the ones that are recorded by Detective Villabaza, and he's the one who's asking all of the leading questions about, were you in fear for your life? And was this a rapidly escalating situation? And for the most part, they're just saying, yes, yes, yes. But we have the key testimony, as Judge Smith has told us, that Officer Catton gave about why it is that he shot. Now, if you look at those pictures that are Exhibits 1D through 1A in the GO Pages 347 to 354, you see some very interesting things. These were pictures taken by the police, whereas Officer Catton says he shot only two or three times in that initial encounter with Mr. Willis. Detective Fern of the Fresno Police Department counts and labels 12 different shots into the front of the blue van. Where did those 12 shots come from? They can only have come from Officer Catton, who claims he only shot two or three times. Almost everything Officer Catton says ends up being a point of discrepancy with somebody else. When the shooting starts, Officer Estacio says, he shot first. He says he thought he hit Willis in the chest. He thought Willis went down. Officer Catton says, oh, no, he was pointing the gun at me and running between the blue van and his own black Infiniti. If you look at those pictures, there's hardly any room to run. It is dark. He has to be looking where he's running. He couldn't possibly have been pointing the gun at Officer Catton. Moreover, once he runs next to the blue van, the blue van is between him and Officer Catton. And yet we see there's a dozen bullet holes in the blue van, including one going through the side window. Officer Catton's story simply does not stand up. Officer Estacio says, follow me, and goes off to the right. What does Officer Catton, who's just gotten out of probation, a delayed probation, by the way, what does he do? He goes in the opposite direction. And the two of them line up on the same plane, according to the defendant's expert, Calinan, and they start shooting at each other. And they said, oh, yes, we had to shoot at each other because Mr. Willis had taken up a position of hiding behind the blue van. And he was pointing a gun at Officer Catton. Well, it is every bit as likely, and a trier of fact could easily have found this, that he was merely cowering from the fusillade of bullets, the 41 bullets that were being fired at him. What else was he supposed to do? Because by the time those officers started firing at him, they were not 20 feet away. They were 10 feet away. Okay. Thank you. Thank you, Your Honor. Agents, all of you will stand for a minute.
judges: Kozinski, O'scannlain, Smith